THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR18-132 RAJ |
| | ) | |
| Plaintiff, | ) | REPLY BRIEF IN SUPPORT OF |
| | ) | MOTION FOR COMPASSIONATE |
| v. | ) | RELEASE PURSUANT TO 18 U.S.C. |
| | ) | § 3582(C)(1) |
| EDWARD DEANDRE LOCKE, | ) | |
| | ) | **Noted: May 22, 2020** |
| Defendant. | ) | |
| | ) | **Oral Argument with Mr. Locke** |
| | ) | **present by video requested** |

# TABLE OF CONTENTS

I.    Summary ................................................................................................... 1

II.   Argument in reply ..................................................................................... 2

    A.   Medical conditions that render an inmate especially vulnerable to Covid-19 complications can constitute extraordinary and compelling reasons for relief. . 2

    B.   The Government's has failed to rebut Mr. Locke's showing of compassionate release eligibility. The Government's response is inadequate because it leaves critical expert testimony unrebutted, ignores a number of Mr. Locke's medical conditions that render him particularly vulnerable to the virus, and improperly minimizes the rest. ............................................................................ 3

        1.   The Court should reject the Government's invitation to overlook Mr. Locke's severe obesity ............................................................................ 3

        2.   The Government failed to rebut eligibility based on diabetes. ..................... 4

        3.   The Government ignores the evidence showing that sleep apnea elevates one's risk of severe complications. ............................................................. 6

        4.   The Government fails to even address Mr. Locke's chronic kidney disease and hypertension, as well as the interplay among sleep apnea, diabetes, and chronic kidney disease. .................................................................. 7

    C.   The sentencing guidelines are neither exclusive nor binding on the Court. ....... 7

    D.   The Government errs in asserting that Mr. Locke is not advancing an inability to practice self-care as an alternative basis for relief, relative to the catchall provision. ......................................................................................... 12

    E.   The fact that no positive cases have yet to have been reported at the FDC is not a basis to withhold release. Both the courts and the BOP have rightly released individuals from institutions not known to be infected. .................................. 12

    F.   The length of his incarceration period is not a basis to deny relief. ................ 17

    G.   Mr. Locke can be safely released. .................................................... 18

III.   CONCLUSION .................................................................... 19

REPLY BRIEF MOTION FOR COMPASSIONATE
RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - ii

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

I.   **SUMMARY**

Edward Locke filed a motion for compassionate release because he suffers from a constellation of medical problems that elevate his risk for severe complications from Covid-19. His motion is supported by findings made in his Presentence Report, medical records, expert declarations, medical literature, statutory authority, and case law. The Government has not even attempted to rebut the expert declarations, cites no opposing medical literature, and cannot credibly argue that Mr. Locke does not currently face an elevated risk. The Government fails to even address a number of medical conditions that elevate his risk (namely hypertension and chronic kidney disease). And it wrongfully trivializes the ailments that it does address (severe obesity, diabetes, and severe obstructive sleep apnea). It makes no comment at all on the fact the United States Probation Office has already approved of Mr. Locke's release plan, and that plan – residency in a single-occupancy apartment maintained by his family's church in the same neighborhood where Mr. Locke excelled on pretrial supervision – could hardly be more robust.

Nevertheless, the Government opposes the motion, contending that Mr. Locke presents some sort of generalized danger that is not at all reflected by the facts of the case and is in fact contraindicated by Mr. Locke's performance on pretrial supervision. And it wrongly contends – contrary to the bulk of the district court rulings on the issue – that an outdated policy statement prevents this Court from even ordering release. When making this argument, the Government does not acknowledge the most recent rulings rejecting its position. The Government next argues that relief should not be granted because it claims that the danger to Mr. Locke and others at the SeaTac Federal Detention Center is speculative because the BOP has not yet reported a Covid-19 infection at the FDC. But risking an outbreak at the FDC is untenable, given the likelihood of harm that Mr. Locke will suffer if infected.

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Finally, the Government suggests that relief should not be granted because in its view Mr. Locke has not yet served enough time. But Mr. Locke should not have to risk severe complications or death to serve a sentence that this Court imposed when it had no reason to believe that a pandemic would create a substantial risk that Mr. Locke will not be able survive that sentence unharmed. And this Court can impose a similarly severe sentence in any event, subjecting Mr. Locke to house arrest for the remainder of the originally served custodial sentence, to be followed by a supervised release term that was even greater than originally imposed. The Court should exercise its discretion and grant Mr. Locke's motion.

## II.    ARGUMENT IN REPLY

As argued in Mr. Locke's motion, once Mr. Locke has shown eligibility for compassionate release, the Government bears the burden of justifying that the originally imposed sentence remains appropriate in the light of the changed circumstances. Dkt. 774 at 20. The Government does not contest this standard. Its response, however, failed to satisfy its burden.

### A.    Medical conditions that render an inmate especially vulnerable to Covid-19 complications can constitute extraordinary and compelling reasons for relief.

The Response argues that Covid-19 alone does not create an extraordinary and compelling reason to grant compassionate release. Response at 12 (dkt. 787). This, however, is not an argument that Mr. Locke has ever made. Rather, he argues that two factors together, the existence of the pandemic combined with his risk of harm brought about by a number of preexisting medical conditions, provide a sound basis for relief. The Honorable John C. Coughenour has endorsed this view: "when an inmate has health conditions that make them significantly more vulnerable to COVID-19, that likewise may constitute an extraordinary and compelling circumstance." *United States v. Dorsey*, No. CR16-0138-BLW-JCC, 2020 WL 2562878, at *2 (W.D. Wash. May 19, 2020) (finding

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

also that defendant's "vulnerability to COVID-19 is a serious medical condition that constitutes an extraordinary and compelling circumstance warranting compassionate release under the U.S. Sentencing Guidelines"). The *Dorsey* court cited medical conditions were obesity, cardiovascular disease, and diabetes. *Id*. The Government's response does not cite this case.

   **B.** **The Government's has failed to rebut Mr. Locke's showing of compassionate release eligibility. The Government's response is inadequate because it leaves critical expert testimony unrebutted, ignores a number of Mr. Locke's medical conditions that render him particularly vulnerable to the virus, and improperly minimizes the rest.**

    *1.* *The Court should reject the Government's invitation to overlook Mr. Locke's severe obesity*

  Mr. Locke provided numerous references in his motion that supported the undisputable truth that obesity is one of the strongest predictors of severe corona virus disease. One of these references was a New York Time Article entitled "*Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*," Motion at 5 (NYT article available at Dkt. 773-3). The Government apparently overlooked this article and its "younger patients" qualifier because it invites the Court to conclude that "Defendant at age 45 is far too young" to be at high risk. The Government's response does not appreciate that, while youth alone does not create an increased risk, preexisting conditions can do so regardless of age.[1] While it is true that old age in and of itself can render someone particularly vulnerable to the virus, so too can any one of the many

---

[1] Representative quotes from the Government's response are: "Defendant at age 45 is far too young to fit in the one of the most prominent and important risk categories"; "It is well-documented that people 65 and older are at greater risk from the virus, but Defendant is a good two decades away from that threshold"; and "Given his age, and the current facts at FDC SeaTac, the defendant has not bet [sic] his burden." Dkt. 787 at 13-14.

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 3

preexisting illnesses from which Mr. Locke suffers. The many authorities cited in Mr. Locke's motion more than adequately document this.

Next, the Government invites that Court to dismiss Mr. Locke's obesity concern because the CDC has defined severe obesity as having a BMI of 40 or higher, and maintains that Mr. Locke is under that cutoff, making no citation to any record. Mr. Locke's BMI is at this precise instant is unknown, but as detailed in his motion at n. 18, Mr. Locke's BMI has hovered either just below or just above this cutoff for years. The values reflected by the cited records there, are, in chronological order ranging from January 24, 2018 to January 20, 2020: 39.47, 38.91, 38.22, 37.94, 38.63, 39.47, 40.18, and 38.6. Dkt. 774 at 8, n.18. The idea that Mr. Locke does not have an elevated risk by virtue of obesity, simply because it is possible that he may be just below the definition cut-off on any given day, is absurd.

The Government makes no response to the fact that the medical records show that Mr. Locke suffers from a form of obesity that makes him especially vulnerable to Acute Respiratory Distress Syndrome. Dkt. 774 at 7-8. And the Government makes no attempt to counter the cited cases noting that "Courts have granted compassionate release to incarcerated individuals with obesity and sleep apnea because those conditions place them at high risk for serious complications due to COVID-19." *United States v. Delgado*, No. 3:18-CR-17-(VAB)-1, 2020 WL 2464685, at *4 (D. Conn. Apr. 30, 2020) (collecting cases); dkt. 774 at 7.

Because of all this, the Government's response has failed to rebut Mr. Locke's showing of eligibility for CR release based on obesity.

### 2. *The Government failed to rebut eligibility based on diabetes.*

Mr. Locke supported his CR motion with the declaration of Dr. Marc Stern, M.D. who reviewed Mr. Locke's recent BOP medical records and concluded that Mr. Locke's

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 4

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

diabetes was being poorly controlled within the FDC. Dkt. 774 at 11; dkt. 774-7. Dr. Stern concluded that Mr. Locke's poorly controlled glucose levels placed Mr. Locke at an especially heightened risk. *Id.* And this conclusion was echoed in the abstract by another declaration, that of Dr. Steven Edelman, M.D., dkt. 774 at 9-10; dkt. 774-6. The conclusion that the FDC was not adequately addressing Mr. Locke's medical needs was further supported by Mr. Locke's treatment provider, Advanced Registered Nurse Practitioner Melissa Stanley. Dkt. 774 at 18; dkt. 774-12. Despite this, the Government erroneously asserts that "much of the evidence to [the current difficulties in managing his diabetic condition] comes from Defendant's self-report." Dkt. 787 at 13.

The Government submitted no opposing evidence, by expert declaration or otherwise, to counter the assertions made by Dr. Stern, Dr. Elderman or ARNP Stanley. Instead, the Government's response attempts to shift the blame upon Mr. Locke, declaring (without any citation to any record) that "it is unknown to what extent the defendant is compliant with treatment…" Dkt. 787 at 13. If there was something in the record that would support that idea that Mr. Locke's negligence is responsible for BOP's difficulties in managing Mr. Locke's diabetes, one presumes the Government would have cited it. There is no such indication, and the record actually suggests that opposite, since ARNP Stanley noted that Mr. Locke had been compliant with his diabetes treatment when not in custody. Dkt. 774-12. The Government's unfounded speculation is irrelevant in any event, since regardless of cause, if his glucose levels are spiking (and the medical records show that they are)[2], he is at an especially heightened risk. To highlight the Government's error in logic, one would not dismiss a patient's elevated risk brought about by obesity by saying, "Well, this is really your fault. Why don't you lose some

---

[2] *See* Declaration of Marc Stern at ¶ 4 (dkt. 774-7); *compare* BEMR 2019-20 Medical Records at page 103 (showing a glucose level of 158 mg/dL on January 16, 2020, shortly after his arrival at the FDC) *with id.* at page 2 (showing a glucose level of 447 mg/dL on April 21, 2020, his most recent reading from the FDC) (dkt. 774-1).

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 5

weight?" Even if Mr. Locke's glucose levels were not spiking, he would still have an elevated risk, since, as noted by Dr. Eldeman, an individual who suffers from type II diabetes is more prone to infection by virtue of a compromised immune system brought about by the diabetic condition: "The risk of complications from COVID-19 is substantially increased for those with a history of poor blood glucose control, regardless of the type of diabetes, because the immune system is compromised and individuals will not be able to fight off any type of infection, including COVID 19." Dkt. 774 at 10; Dkt. 774-6). The Government ignores this as well. Regardless of the precise nature of the risk brought about by diabetes, it cannot seriously be questioned that Mr. Locke's risk would be reduced if he were released to an environment where he could practice social distancing.

### 3. The Government ignores the evidence showing that sleep apnea elevates one's risk of severe complications.

The Government's response devotes only two sentences to Mr. Locke's sleep apnea. Dkt. 787 at 14. The first sentence is: "Defendant *appears to have sleep apnea*, and claims this makes him more vulnerable to the virus." *Id.* (emphasis added). This is quite an understatement, given that a medical provider described Mr. Locke's condition as one "of the most severe cases of apnea I have ever seen." Motion at 17 (dkt. 774). The Government's second and final sentence directed to sleep apnea is, "However, sleep apnea is not identified by the CDC as a risk factor with the virus, and Defendant does not point to any reliable medical literature supporting this proposition." Dkt. 787 at 14. While the CDC may not have explicitly recognized sleep apnea as a risk factor, the remainder of the Government's statement is incorrect, since Mr. Locke cited both medical literature and his own medical records to document that sleep apnea can complicate and worsen his other conditions (namely chronic kidney disease, hypertension, and diabetes) that by themselves elevate his risk. Dkt. 774 at 17 nn. 38 and 39 and the accompanying text. The

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 6

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Government's response ignores all this, as well as those cases that have granted release based on sleep apnea and other conditions that Mr. Locke has (e.g., obesity, hypertension, high cholesterol). *See* dkt. 774 at 7-8 (citing *Delgado*, *supra*, which collected cases).

### 4. The Government fails to even address Mr. Locke's chronic kidney disease and hypertension, as well as the interplay among sleep apnea, diabetes, and chronic kidney disease.

As recognized by the National Kidney Foundation and outlined in Mr. Locke's motion, chronic kidney disease also elevates one's risk for severe complications from the virus. Dkt. 774 at 16. The Government's response is remarkable in that it does not address this condition at all: its response does not even contain the word "kidney." Nor does the Government meaningfully address Mr. Locke's hypertension, despite that fact that this condition too has been shown be "independently associated with severe COVID-19." *Id.*[3] It acknowledges his hypertension only in a summary paragraph, providing no rebuttal regarding the impact of this condition. Dkt. 787 at 5. The Government also did not rebut (or even acknowledge) the arguments that Mr. Locke made – supported by medical literature and his own medical records – that he faces a heightened risk because of the interplay among sleep apnea, hypertension, chronic kidney disease, and diabetes. Dkts. 774 at 16-17; 774-10, 774-11.

### C. The sentencing guidelines are neither exclusive nor binding on the Court.

The Government's takes the position that the Sentencing Commission's policy statement on compassionate release remains controlling in the wake of the First Step Act. *See* Dkt. 787 at 8-9. The Government notes that "numerous courts" has so held, including a judge in this district. *Id.* at 9. This is accurate, but the dominant view is exactly the opposite: "a majority of the district courts have concluded that the 'old policy statement

---

[3] Citing Paul M. Palevesky, M.D., et. al, "Coronavirus disease 2019 (Covid-19): Issues related to kidney disease and hypertension, UpToDate (updated May 1, 2020).

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 7

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

provides helpful guidance, [but]. . . does not constrain [a court's] independent assessment
of whether "extraordinary and compelling reasons" warrant a sentence reduction under §
3852(c)(1)(A))." *United States v. Rodriguez*, 2020 WL 1627331, at *4 (E.D. Penn. Apr.
1, 2020) (adopting majority view as "more persuasive"). Other courts have described it
as a "vast majority." *United States v. Almontes*, 2020 WL 1812713, *3 (D. Conn. Apr. 9,
2020) ("I agree with the vast majority of district courts: I can consider whether reasons
other than the inmate's medical condition, age, and family circumstances amount to an
extraordinary and compelling reason to reduce that inmate's sentence."); *see also United
States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *15 (E.D.N.Y. Apr. 22,
2020) (stating that "[t]hese [majority] decisions reflect, to borrow a term, the right side
of history on the crucial legal questions they consider" and concluding court has authority
to "determine what 'Other Reasons' (as that term is used in Application Note 1(D))
qualify as 'extraordinary and compelling' regardless of BOP's view on the matter and
without having to await a someday-updating by the Commission of its unquestionably
outdated policy statement"); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020
WL 806121 (D. Utah Feb. 18, 2020) (rejecting the Government's invitation to "follow
the minority of courts that have held that the Sentencing Commission's policy remains
binding").[4]

---

[4] There are many more cases recognizing this is the majority opinion and following it,
and yet more cases adopting the position without noting that it is the majority position.
*See, e.g.*, *United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815, at *6 (M.D.
Tenn. Mar. 4, 2020) ("A majority of the district courts that have considered the issue have
likewise held, based on the First Step Act, that they have the authority to reduce a
prisoner's sentence upon the court's independent finding of extraordinary or compelling
reasons"); *United States v. Etzel*, No. 6:17-CR-00001-AA, 2020 WL 2096423, at *3 (D.
Or. May 1, 2020) ("The Court is persuaded by the reasoning of numerous other district
courts and holds that it is 'not constrained by the BOP Director's determination of what
constitutes extraordinary and compelling reasons for a sentence reduction.'" (quoting
*Young, supra*); *United States v. Perez*, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020)
("[A] majority of federal district courts have found that the most natural reading of the

The Government begins its discussion by citing *Dillon v. United States*, 560 U.S. 817 (2010) for support. Dkt. 787-8. But *Dillon* has nothing to do with the statutory and guideline language at issue here. Nor did it involve an anachronistic policy statement that, as construed by the Government, would run afoul of an act of Congress, as so many courts have held. The Court in *Dillon* simply held that, in granting a sentence reduction based on a retroactive amendment to the crack cocaine base offense levels, the district court should comply with the specific and current policy directive of U.S.S.G. § 1B1.10 to "leave all other guideline application decisions unaffected." *Id*. at 821–22.

The Government nevertheless contends that, because the First Step Act changed only who could bring motions, there is nothing outdated in the policy statement. Dkt. 787 at 9. Cases such as *Rodriguez* and *Maumau* explain in detail why that position is untenable. And the Response does not alert the Court that two judges in this district have ruled against the Government on this very issue.

As discussed in Mr. Locke's Motion (dkt. 774 at 22), the Honorable Robert J. Bryan, in granting compassionate release, made clear that, notwithstanding the old policy statements, this Court has the discretion to "determine what qualifies, after appropriate analysis" and that the listing of examples of extraordinary and compelling reasons in

---

amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it."); *United States v. Pawlowski*, No. CR 17-390-1, 2020 WL 2526523, at *5 (E.D. Pa. May 18, 2020) ("Interpreting this application note in light of recent amendments to the compassionate release statute, a majority of the district courts that have considered the issue have concluded that a *court* (not just the BOP) may independently determine whether extraordinary and compelling reasons, other than the reasons listed in the policy statement, exist in a particular case"); *United States v. Hull*, No. 3:17-CR-132 (SRU), 2020 WL 2475639, at *2 (D. Conn. May 13, 2020) ("As I and the majority of district judges have held, courts may make that determination independent of the BOP.")

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

U.S.S.G. § 1B1.13 app. n.1(A)-(C) are not exclusive. *United States v. McPherson*, No. CR94-5708RJB, 2020 WL 1862596, at \*4 (W.D. Wash. Apr. 14, 2020).

And the Honorable Ricardo M. Martinez reached a similar conclusion. "[T]he Court may determine that 'extraordinary and compelling' reasons may exist beyond those delineated by the commentary to U.S.S.G. § 1B1.13." *United States v. Cosgrove*, No. CR15-230-RSM, 2020 WL 1875509, at \*5 (W.D. Wash. Apr. 15, 2020) (quoting *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at \*4 (D. Conn. Apr. 1, 2020)).

As stated by other courts, "'extraordinary and compelling' circumstances may exist outside of those circumstances delineated by the U.S. Sentencing Commission, given the advisory nature of the guidelines, *United States v. Booker*, 543 U.S. 220 (2005), and their conflict with the statutory language of the First Step Act amendments." *United States v. Rivera*, No. 3:17-cr-00159-6 (VLB), 2020 WL 1909227, at \*4 (D. Conn. Apr. 10, 2020).

Of the cases the Government does cite, none is persuasive. *See* Dkt. 234 at 8. First, the Government relies on *United States v. Washington*, No. 5:13-020-DCR, 2019 WL 6220984 (E.D. Ky. Nov. 21, 2019)). That case is irrelevant, as the court in *Maumau* explained, because it addressed compassionate release requests based on subdivisions A through C of the Sentencing Commission's policy—for medical condition, age, or caregiver status. *See Maumau*, 2020 WL 806121, at \*3. *Washington* held only that rehabilitation alone does not constitute extraordinary and compelling reasons for compassionate release; it did not resolve the broader question of whether the catch-all provision in subsection D is limited to situations determined by BOP to meet the criteria.

The Government cites to *United States v. Fuller*, 17-CR-324-JLR, 2020 WL 2557337 (W.D. WA. May 20, 2020), a decision from this district. That decision conducts no independent analysis of the issue, but simply refers to the court's earlier decision in

*Riley v. United States*, No. C19-1522JLR, 2020 WL 1819838 at *8 (W.D. Wash. Apr. 10, 2020). The analysis is not much deeper in *Riley*; the court went along with the decision of what it considered to be the majority of Ninth Circuit district courts on the issue (citing a total of four decisions) "[i]n the absence of contrary controlling authority[.]"[5] *Id.* Furthermore, *Riley* was decided six weeks ago; the ever-growing chorus of courts joining the majority side on this issue – with detailed analysis supporting their conclusion – might well have convinced the *Riley* court to reach the opposite conclusion, just as the *Maumau* court remarked that another court might have reached a different conclusion on the issue, had it decided the matter with the benefit of all the decisions reached after it. *See Maumau*, 2020 WL 806121, at *6 (discussing *United States v. Shields*, No. 2019 WL 2645028, at *2 (N.D. Cal. June 27, 2019)). Even assuming the majority of decisions within the Ninth Circuit are what matter, since *Riley* was issued, at least three courts from the Ninth Circuit, two from this district, have joined the majority view. Beyond *McPherson*, and *Cosgrove, see*, *e.g.*, *United States v. Etzel*, No. 6:17-CR-00001-AA, 2020 WL 2096423, at *3 (D. Or. May 1, 2020) (and other decisions from the same court).

That leaves *United States v. Willingham*, No. CR113-010, 2019 WL 6733028 (S.D. GA Dec. 10, 2019) (rejecting premise that courts would have discretion under Subdivision D to consider whether circumstances other than those listed in Subdivisions A through C amounted to "extraordinary and compelling" reasons), and *United States v. Garcia*, No. 4:05-cr-40098, 2020 WL 2039227 (C.D. Ill. Apr. 28, 2020). These cases do actually present the minority view, but as noted that view has been rejected by most courts. *United States v. Scott*, No. 17-CR-156, 2020 WL 2508894, at *8 and n. 3 (E.D.

---

[5] There is nothing about Ninth Circuit law that would make the decisions of the district court in this Circuit any better a prediction of what the Ninth Circuit would ultimately hold than the decisions from district courts around the country.

Wis. May 15, 2020) (citing to *Garcia* and its concession that current policy statement is a "relic"; concluding that the policy statement "cannot be given controlling weight without placing it in serious tension, if not conflict, with the First Step Act"; as a result, the court refused "to give the BOP control over what constitutes an extraordinary and compelling reason" as would appear to be required under catchall portion of policy statement); *United States v. Chan*, No. 96-cr-00094-JSW-13, 2020 WL 1527895 (N.D. Cal. Mar. 31, 2020) (finding reasoning of *Willingham* and *Shields* unpersuasive and concluding "that it could – and would – apply Subdivision D to determine 'whether any extraordinary and compelling reasons other than those delineated in' the other subdivisions warrant a reduction in Chan's sentence.").

**D.    The Government errs in asserting that Mr. Locke is not advancing an inability to practice self-care as an alternative basis for relief, relative to the catchall provision.**

In Section III.A.5 of his motion, Mr. Locke contended, with citation to authorities, that his inability to practice critical self-care provided a basis independent basis for relief. Dkt. 774 at 30-31. The Government overlooked this in its response, incorrectly asserting that Mr. Locke advanced no such argument. Dkt. 787 at 10. Because the Government failed to respond to this argument, no reply is necessary.

**E.    The fact that no positive cases have yet to have been reported at the FDC is not a basis to withhold release. Both the courts and the BOP have rightly released individuals from institutions not known to be infected.**

The Government contends that relief is inappropriate because no known case has yet been reported at the FDC. It submitted the FDC's most recent coronavirus response update, claiming that it documents the "extraordinary steps" that the BOP has undertaken. Dkt. 787 at 12; dkt. 787-1. While it is fortunate that there have not yet been any Covid-19-related deaths at the FDC, fortune is really all it is. There are gaping holes in the FDC protective measures, which are the same ones that were relied upon throughout all of

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 12

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

BOP facilities and have resulted in at least 59 deaths as of this writing.[6] Other than new inmate arrivals, asymptomatic individuals (either inmates or staff) are not tested at all,[7] and given the daily shuffle of FDC staff and contractors, it remains probable that the virus will find its way into the institution if it has not already; when it does, Mr. Locke will be at extreme risk. *See* Declaration of Dr. Marc Stern at ¶¶ 6-10 (describing inability to practice social distancing in detention facilities) (dkt. 774-7); *see also* Motion at 31-34 (describing meaningless nature of BOP's testing reports) (dkt. 774). And because the FDC can neither reverse Mr. Locke's chronic medical conditions nor provide him with a space that allows him to practice social distancing, there is little the FDC can do about this. The most recent BOP Coronavirus Response Update, which claims that the FDC is requiring inmates to maintain social distancing, is not accurate. *See* dkt. 787-1 at 2. The overwhelming majority of inmates housed at the FDC – including Mr. Locke[8] – are sharing a cell so small that social distancing is impossible. If there is any debate about this, an evidentiary hearing should be held with BOP staff present so they can be cross-examined on the point.

---

[6] https://www.bop.gov/coronavirus/ (visited May 22, 2020).

[7] Undersigned counsel requested discovery as to the details of the FDC's testing protocols and the percentages of FDC inmates and staff who have been tested via an email of May 20, 2020. The Government has not yet provided any such percentages, or provided any information regarding the testing protocols beyond that described in the update that is attached to its response, dkt. 787-1. Undersigned defense counsel understands that Government's response to mean that the USAO has no more information than is relayed by that update.

[8] Undersigned counsel confirmed this with Mr. Locke in a telephone call on the date of this May 22, 2020. In fact, Mr. Locke shares a cell with an inmate who is charged with cleaning the common areas in the unit where Mr. Locke and his cellmate live. If proper cleaning protocols are not followed, the job that his cellmate holds could lead to contamination of Mr. Lock's shared cell.

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Moreover, as noted in Section III.A.6 of the motion, a number of cases have recognized that district courts should not withhold compassionate release relief on the theory that the wolf is only approaching the door, but has not yet crossed the threshold. Dkt. 775 at 31-33. Because the Government did not address the cases cited in this section, no direct reply is needed. But an incongruity in the Government's position needs to be remarked upon, since the BOP has released individuals based on feared impact of the virus even when no known cases existed at the institution where the individual was housed.

The Compassionate Release Statute directs the Court to consider the sentencing factors set forth in 18 U.S.C. § 3555(a), which includes promoting respect for the law, providing just punishment for the offense, and providing medical care in the most efficient manner. 18 U.S.C. § 3553(a)(2)(B, C, D); 18 U.S.C. § 3582(c)(1)(A). This, coupled with the broad discretion vested with the Court in deciding when a grant of compassionate release is appropriate, *see, e.g*, *McPherson*, *supra*, allows this Court to consider the facts of other cases, which includes individuals who were released to home confinement under the Cares Act. *See, e.g., United States v. Stephenson*, No. 3:05-CR-00511, 2020 WL 2566760, at *7 (S.D. Iowa May 21, 2020) ("Several courts, including this one, also have held that sentencing disparities created by criminal law reforms can be considered as part of a compassionate release motion."); *see also* Response at 11, 14 (dkt. 787) (expressing concern about sentencing disparities and citing the Cares Act). The case of Paul Manafort warrants inspection.

Paul Manafort was released to home confinement based on medical conditions (other than age) that appear to be less serious than Mr. Locke's. He was sentenced to a 72-month term of imprisonment, was released despite the fact that he did not meet BOP's time-served threshold for such release. Eileen Sullivan, Paul Manafort, "*Trump's Ex-*

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Campaign Manager, Released to Home Confinement*," The New York Times (May 13, 2020).[9]

Attached as Exhibit O is the letter his attorneys wrote to the BOP Director Michael Carvajal, requesting that release. The letter notes that Mr. Manafort suffered from high blood pressure, liver disease, and unspecified respiratory ailments. *See* Letter to BOP Director at 2. In contrast, Mr. Locke suffers from obesity, diabetes, kidney disease, severe obstructive sleep apnea, and high blood pressure (and more) (*see* Motion, dkt. 774 at 5-17). Given the greater number of ailments, Mr. Locke's medication list is more extensive than Mr. Manafort's, but Mr. Locke medications are similar to Mr. Manafort's for the conditions that they share. Here is a comparative list, drawn from the chart that his attorneys provided in their letter to Director Carvajal:

| PAUL MANAFORT'S MEDICATIONS | EDWARD LOCKE'S MEDICATIONS[10] |
|---|---|
| | |
| **HBP** | **HBP** |
| Hydralazine 40 mg | Hydralazine 25 mg |
| Amlodipine 10 mg | Amlodipine 10 mg |
| Carvediol 50 mg | Losartan Potassium 100 mg |
| Lisinopril 40 mg | - |
| | |

---

[9] https://www.nytimes.com/2020/05/13/us/politics/paul-manafort-released-coronavirus.html

[10] The medications and dosages listed in this chart can found at BEMR 2019-20 at pp. 29 and 72 (Exhibit A of Motion, dkt. 774-1).

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 15

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

| **ANXIETY** | **ANXIETY** |
|---|---|
| Buspirone 15 mg | Fluoxetine (Prozac) 20 mg |
| | |

| **ELEVATED CHOLESTEROL** | **ELEVATED CHOLESTEROL** |
|---|---|
| Atorvastatin 20 mg | Atorvastatin 40 mg |
| | |

Mr. Manafort's case is similar to Mr. Locke's in so far as he was released from a BOP facility despite that fact that there were no reported cases at the time. *See* Letter to BOP Director at 1. Mr. Manafort's case is dissimilar to Mr. Locke's in that Manafort performed disastrously on pretrial release, being remanded into custody after being accused of witness tampering.[11] In contrast, Mr. Locke's final PTS report was entirely positive (dkt. 774 at 4). Given that Mr. Manafort was entitled to release due to health concerns brought about by the virus, so is Mr. Locke.

Having every advantage in life, Mr. Manafort chose a path of corruption driven by pure greed.[12] And once confronted with charges, he responded by trying to obstruct justice. In contrast, when Mr. Locke was confronted with his charges, he responded by eliminating his drug use, finding gainful employment, and complying with every release condition placed upon him. *See* PSR at ¶¶ 3, 133; Dkt. 774 at 4 (quoting PTS report).

---

[11] Josh Gerstein, "*Manafort jailed after alleged witness tampering*," Politico (June 15, 2018). https://www.politico.com/story/2018/06/15/manafort-jailed-after-alleged-witness-tampering-648988

[12] Sharon LaFraniere, et al, "*The Rise and Fall of Paul Manfort: Greed, Deception and Ego*," The New York Times (August 12, 2018). https://www.nytimes.com/2018/08/12/us/politics/manafort-trump-trial.html?searchResultPosition=6

Denying Mr. Locke release while providing it to Mr. Manafort would not promote respect for the law, but would fuel cynicism that a more lenient set of rules apply to privileged white-collar defendants, relative to individuals such as Mr. Locke who endured a disadvantaged upbringing.[13] *Cf. United States v. Sample*, 901 F.3d 1196, 1201 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1545, 203 L. Ed. 2d 746 (2019) ("noting the importance of 'minimiz[ing] discrepancies between white- and blue-collar offenses, and limit[ing] the ability of those with money or earning potential to buy their way out of jail'" (brackets in *Sample*, quoting *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)).

Regardless of the comparison between white- and blue-collar defendants, one point is clear: BOP considers it appropriate to decrease prison populations both for the benefit of both remaining inmates and for the safety of high risk individuals, even when the facility currently has no reported Covid-19 cases. It does this at the same time that another arm of the Department of Justice urges this Court to reject compassionate release because a facility has no such cases. This Court should follow BOP's lead in this regard, consistent with the cases cited at Section III.A.6 of the motion, see dkt. 775 at 32.

**F.    The length of his incarceration period is not a basis to deny relief.**

The Government asserts that the Court should not exercise its discretion in releasing Mr. Locke because he has not served enough time. Dkt. 787 at 16, 18. But Mr. Locke should not have to risk death, a prolonged recovery, or permanent impairments so that he can perhaps complete a sentence that this Court imposed under a different set of circumstances than exists today. When the Court ordered its 62-month sentence, it assumed a functioning BOP in a pandemic-free world. The phrase "social distancing" was not then even part of the parlance. The Court could not have anticipated that Mr.

---

[13] *See* PSR ¶¶ 55, 105-100; Motion at 2 (dkt. 774).

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 17

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Locke would be confined under circumstances that present a continuing risk to his health. And Mr. Locke – when he waived his right to trial and elected to plead guilty – anticipated serving his time at a facility that might allow for meaningful programming or improvement. None of that is happening now of course, as he is locked down constantly. And the Court can fashion a sentence that provides adequate punishment by ordering a prolonged period of house arrest, followed by a lengthy term of supervised release, with stringent conditions, including additional electronic home monitoring.

### G.      Mr. Locke can be safely released.

The Government tries to gin up arguments suggesting that Mr. Locke was among the worst defendants sentenced in this case and that he presents an on-going danger as a result. The Government reaches back to offenses so old that they don't score, it cites "arrests that did not result in convictions" and even cites "seven additional driving offenses" as supposed evidence of incorrigibility. Dkt. 787 at 4. It tries to brand him as an "armed redistributor" and repeats a variation of this term often, in the hopes of biasing the Court against him. All of this ignores the facts of the case, as set forth in the agreed-upon plea statement and the PSR. Mr. Locke was engaged in street level sales. He was not a major player here, and he never brandished his weapon or threatened anyone with it. Dkt. 774 at 1-2; PSR ¶¶ 52-56. Defense Sentencing Memo at (dkt. 700); dkt. 774 at 1-2. Even one of Mr. Locke's medical records – produced after he was sentence – document that he kept this gun for his own protection because he had been shot multiple times growing up. Dkt. 774 at 2 n. 4; dkt. 774-1 at p. 20.

Only the Court knows what it really thought of Mr. Locke, but the fact that it imposed only a two-month sentence for the drug offense suggests that the 62-month sentence was driven more by the mandatory minimum at play, as opposed to a belief that Mr. Locke represented an on-going danger.

MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(C)(1)
(*United States v. Locke*, CR18-132 RAJ) - 18

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1      That Mr. Locke can be safely released is circumstantially demonstrated by the fact

2   that the USPO has approved of his proposed release address. There is really no way his

3   release plan could be stronger. He will be able to maintain social distance from everyone

4   by virtue of the fact that he will be living in single-occupancy apartment. The apartment

5   is maintained by his Church. And it is located in the same Beacon Hill neighborhood

6   where he was safely supervised by the USPO for a year and half. The Government

7   response does not acknowledge (or even comment on) the strength of this plan.

8   **III.      CONCLUSION**

9   The Court should grant Mr. Locke's motion.

10   DATED this 22nd day of May, 2020.

11                                    Respectfully submitted,

12                                    s/ *John R. Carpenter*

13                                    Assistant Federal Public Defender
                                      Attorney for Edward Deandre Locke

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**